The STATE of Ohio, Appellee,

v.

COLLINS, Appellant.

[Cite as *State v. Collins* (1994), 97 Ohio App.3d 438.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 64949.

Decided May 5, 1994.

440

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *Thomas Conway*, Assistant Prosecuting Attorney, for appellee.

*Paul F. Markstrom*, for appellant.

KRUPANSKY, Judge.

Defendant-appellant Germaine Collins appeals from his jury conviction for the murder of Vernell Arrington in violation of R.C. 2903.02.

Defendant was indicted by the Cuyahoga County Grand Jury August 6, 1992 for the aggravated murder of Arrington, purposely with prior calculation and design, in violation of R.C. 2903.01(A). The charges stemmed from an incident in which the victim, who suffered from the advanced stages of sickle cell anemia, was stabbed by defendant twelve times with a knife in the lobby of an apartment complex. Several witnesses observed the incident, which occurred at approximately 5:00 p.m. on July 31, 1992, at the facility operated by the Cleveland Metropolitan Housing Authority ("CMHA") for elderly and disabled residents located at 16700 Lake Shore Boulevard.

Defendant was found to be sane at the time of the stabbing and competent to stand trial for the killing. The matter proceeded to a jury trial commencing December 14, 1992. The prosecution argued that defendant purposely, with prior calculation and design, specifically intended to kill the victim. Defendant did not dispute killing the victim, but argued that his actions were justified by self-defense.

The prosecution presented testimony from the following thirteen witnesses to support the aggravated murder charge, *viz.*: (1) two witnesses to the incident who resided in the apartment building, *viz.*, Sally Colston and Reverend John Spires; (2) deputy coroner, Dr. Stanley Seligman, M.D.; (3) Cleveland police officers Jeffrey Wagner, Richard Gokey, William Hardwick, William Neider, and Michael O'Malley; (4) CMHA communications officer, Ralph Hamilton; (5) Rocky River police officer, Gerald Gouch; (6) Waddell Jefferson, a female acquaintance of defendant and the victim; (7) the victim's mother, Delores Webb; and (8) a physician who treated the victim for sickle cell anemia for fifteen years prior to his death, Dr. Susan Blakely–Shurin.

Reverend Spires testified he rode in an elevator with defendant and the victim down to the lobby of the apartment building prior to the incident. Defendant and the victim exchanged "stares" while riding in the elevator. Spires remained in the lobby while the two left the apartment building. Defendant returned to the lobby moments later followed by the victim. Reverend Spires testified that he

could not see the subsequent altercation between the two from his vantage point in the lobby.

Sally Colston stated she lived in the apartment building down the hall from defendant and his grandmother and was acquainted with both of them prior to the incident. Sally Colston testified she arrived in the apartment lobby and heard defendant threaten the victim as defendant returned to the lobby from outside prior to the stabbing. Colston "hated" to say that defendant declared he would have to "fight" or "kill" the victim. Colston described the subsequent altercation as "the fastest fight I ever seen in my life." Defendant struck the victim several times with his fists and stabbed the victim as the victim began to get up from the floor. Colston stated the victim did not say anything to defendant or have a weapon during the altercation.

Deputy coroner Seligman testified the victim was stabbed twelve times in his head, face and upper left arm. The victim died from a stab wound through his right temple which pierced his skull and penetrated his brain to a depth of one inch. Dr. Seligman, along with the victim's mother Delores Webb and treating physician Dr. Blakely–Shurin, testified the victim was disabled from the advanced stages of sickle cell anemia prior to the incident.

The testimony revealed that sickle cell anemia is a progressively debilitating condition which involves the breakdown of red blood cells and results in the reduced flow of blood and oxygen to muscles, body tissue and organs. Dr. Blakely–Shurin testified the victim had repeatedly been hospitalized for treatment of his condition since 1977, including forty-six days during 1992 until his release on July 21, 1992 ten days prior to his death. Dr. Blakely–Shurin stated the victim's hips had degenerated from inadequate blood supply and his right hip had been surgically replaced. The victim walked with a limp and suffered from similar damage to his left shoulder which prevented him from raising his arm above the shoulder. Dr. Blakely–Shurin testified that sickle cell anemia impairs a patient's physical activity and endurance. In addition, she stated in her opinion the victim could not have sustained physical activity for more than ten to fifteen minutes.

Several police officers testified concerning their response to the scene and investigation of the homicide. CMHA communications officer Ralph Hamilton testified that he received a telephone call on the evening of the incident at approximately 10:00 p.m. The caller stated he stabbed someone with a knife on Lake Shore Boulevard in "self-defense." Hamilton stated he transferred the caller to Cleveland Police homicide Detective O'Malley. The caller informed Detective O'Malley that he was calling from a telephone at a Wendy's restaurant on Center Ridge Road in Rocky River. Defendant was subsequently arrested by the Wendy's restaurant by Rocky River patrolman Gerald Couch. Defendant

claimed he had ingested drugs in an attempt to commit suicide and was taken to Fairview Hospital for examination.

Wadell Jefferson, the girlfriend of the victim's best friend Les Smith, testified she met defendant at a park on July 25, 1992 six days prior to the incident. Jefferson stated she subsequently received a series of threatening telephone calls from defendant at her home. The victim spoke to defendant on July 27, 1992 during one of these threatening phone calls. According to Jefferson, during a subsequent telephone call, defendant threatened to shoot her, her boyfriend Smith and the victim. Defendant made a total of ten or more threatening telephone calls to Jefferson and ceased making the calls on July 29, 1992 two days prior to the incident. Jefferson testified that her boyfriend Les Smith, who suffered from sickle cell anemia like the victim, died from this condition prior to the trial in the case *sub judice.*

Defendant presented testimony from the following six witnesses after the denial of his motion for judgment of acquittal, *viz.:* (1) two witnesses from the apartment building, resident Eugene Wood and snack shop worker Ruby Badgette; (2) defendant's mother and grandmother, Angelique and Elizabeth Collins, respectively; (3) defendant; and (4) a private investigator retained on behalf of defendant, Paul Raudenbush. Eugene Wood and Ruby Badgette testified they did not observe the stabbing or see prosecution witnesses Colston or Reverend Spires in the apartment lobby at the time of the incident. Badgette stated she responded to a request by Wood for assistance and called 9–1–1.

Defendant testified that he met Wadell Jefferson on July 25, 1992, six days prior to the altercation. Defendant stated contrary to her testimony, however, that the victim threatened defendant during several telephone calls and defendant did not threaten the victim. Defendant's grandmother and mother both stated defendant informed them of the threats by the victim; however, neither defendant's mother nor grandmother personally heard such threats. The witnesses testified defendant had previously been picked on by others in unrelated incidents while he was a juvenile and suffered a broken jaw six years earlier. None of these prior incidents involved the victim.

Defendant's mother stated she informed defendant after a phone call on the evening of July 29, 1992 that "if this person [allegedly threatening defendant] was handicapped, that nine times out of ten he wouldn't come on him [defendant] one on one." Defendant's grandmother testified defendant received a telephone call on the morning of the incident before she left her apartment approximately eight hours prior to the altercation at about 9:00 a.m. However, the record contains no testimony that this telephone call was from the victim or that any threats were made at this time. Defendant did not testify that any of the allegedly threaten-

ing phone calls made to him by the victim occurred after July 28, 1992 or within three days of the July 31, 1992 stabbing.

Defendant testified he encountered the victim on the elevator the day of the incident and the two "stared" at each other but did not exchange any words. According to defendant, after the two were outside the apartment building, the victim stated to him "What's up now, punk bitch?" and attempted to strike him. Defendant stated the victim, whom he did not know was crippled, prevented him from catching a bus by walking in front of defendant outside the apartment building. Defendant stated the victim confronted him a second time in the apartment lobby and the two began to wrestle. Defendant stated he reached into his left pants pocket, grabbed an already open pocket knife and began stabbing the victim when defendant thought he would pass out from being choked. Defendant stated he left the apartment building, got rid of his pocket knife, took a bus to Tower City and went clothes shopping. Defendant subsequently took another bus to Westgate Mall and continued his clothes shopping.

Defendant admitted he told Rocky River police a different version of these events, including that he stabbed the victim with a piece of broken glass, and lied about taking an overdose of drugs to commit suicide at the time of his arrest. The record demonstrates defendant did not complain about any injury to his neck or have any bruises, scrapes or marks when admitted to Fairview Hospital following his arrest.

The trial court submitted the case to the jury following the parties' closing arguments and its instructions to the jury on the indicted offense of aggravated murder, the lesser included offense of murder and the affirmative defense of self-defense. The record demonstrates the trial court denied defendant's oral request at the close of the evidence for an instruction on the lesser offense of voluntary manslaughter.

The jury rejected defendant's claim of self-defense and returned a verdict following deliberations finding him guilty of the lesser included offense of murder. The trial court thereafter sentenced defendant to incarceration for fifteen years to life in an order journalized December 28, 1992. Defendant, through newly appointed appellate counsel, timely appeals, raising two assignments of error.

Defendant's first assignment of error follows:

"The trial court violated the appellant's Fourteenth Amendment right to due process and committed prejudicial error in refusing the defense request to give instructions on voluntary manslaughter."

Defendant's first assignment of error lacks merit.

■ Defendant argues the trial court improperly failed to instruct the jury on the lesser offense of voluntary manslaughter in the case *sub judice.* Defendant claims on appeal that the instruction was warranted based on the testimony at trial concerning prior threatening telephone calls and the victim's subsequent pursuit and physical aggression against defendant which incited defendant into using deadly force.

■ However, the Ohio Supreme Court has recently recognized that voluntary manslaughter instructions are not mandated in all aggravated murder or murder prosecutions. *State v. Shane* (1992), 63 Ohio St.3d 630, 590 N.E.2d 272. Rather, voluntary manslaughter instructions are warranted only when there is sufficient evidence presented at trial which would allow the jury to *reasonably* reject the greater offense of aggravated murder or murder and find defendant guilty of the lesser offense of voluntary manslaughter. *Id.* at 632–633, 590 N.E.2d at 274–275. Based on a meticulous review of the record in accordance with this standard, defendant has failed to exemplify any error in the case *sub judice.*

R.C. Chapter 2903 establishes several degrees of homicide based on the *mens rea* of the defendant when causing the death of the victim. R.C. 2903.01 defines the offense of aggravated murder for which defendant was indicted in the case *sub judice* as follows:

"(A) No person shall purposely, and with prior calculation and design, cause the death of another."

R.C. 2903.02 defines the lesser included offense of murder, by omitting the "prior calculation and design" element of aggravated murder, as follows:

"(A) No person shall purposely cause the death of another."

Both offenses include the word "purposely," which means specifically intended. R.C. 2901.22(A). Finally, R.C. 2903.03 defines the inferior-degree offense of voluntary manslaughter, by reducing the *mens rea* of these two offenses from "purposely" to "knowingly" and adding the mitigating circumstances of sudden passion or sudden fit of rage brought on by serious provocation, as follows:

"(A) No person, while under the *influence of sudden passion* or in a *sudden fit of rage,* either of which is brought on by *serious provocation occasioned by the victim* that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another." (Emphasis added.)

As noted above, there is no dispute that defendant "caused the death" of the victim. The prosecution argued defendant committed aggravated murder by purposely, *i.e.,* intentionally, and with prior calculation and design causing the death of the crippled victim. The defense argued that defendant committed the

offense but his actions were justified to save his own life or on the theory of "self-defense."

The defense subsequently sought to shoehorn the issue of voluntary manslaughter into the case for the first time at the conclusion of the trial after the prosecution introduced the element of doubt regarding defendant's claim of self-defense. However, based on our review of the record, none of the testimony presented at trial as a matter of law indicated defendant acted under the *influence of sudden passion or in a sudden fit of rage caused by the victim* which was *reasonably sufficient to incite defendant into using deadly force* to warrant a voluntary manslaughter instruction.

When viewed in the light most favorable to defendant, the evidence indicated the victim threatened defendant on the telephone three days prior to the incident. By defendant's own testimony, no further words were exchanged between defendant and the victim and the two simply exchanged "stares" in the elevator shortly before the incident. Defendant stated the victim thereafter "confronted him with conversation" outside the apartment building by asking "What's up now, punk bitch?" and attempted to strike defendant with his fists. Defendant stated he dodged any blows, however, until the victim followed him into the apartment lobby and struck defendant with his fists and a folded umbrella. Defendant stated he retrieved his open pocket knife from his left pants pocket, began wildly swinging the pocket knife and subsequently stabbed the victim because the victim was choking defendant and defendant was in fear for his life.

The Ohio Supreme Court has repeatedly recognized that telephone calls between defendant and the victim do not support a claim of sufficient provocation to warrant a voluntary manslaughter instruction when made days or hours prior to the incident as in the case *sub judice*. *State v. Huertas* (1990), 51 Ohio St.3d 22, 31–32, 553 N.E.2d 1058, 1068–1069; *State v. Pierce* (1980), 64 Ohio St.2d 281, 284, 18 O.O.3d 466, 467, 414 N.E.2d 1038, 1040. More recently, the Supreme Court has held that even when made face to face immediately prior to an altercation, "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Shane, supra,* 63 Ohio St.3d 630, 590 N.E.2d 272, paragraph two of the syllabus. We find as a matter of law the words "What's up now, punk bitch?" in the case *sub judice* do not constitute reasonably sufficient provocation to incite the use of deadly force.

The only remaining circumstance which could conceivably support defendant's claim of serious provocation to incite his use of deadly force in the case *sub judice* was the victim's allegedly aggressive behavior. However, the Sixth District Court of Appeals has rejected the contention that the use of a headlock while wrestling constitutes sufficient provocation to stab the victim in *State v. Oviedo* (1982), 5 Ohio App.3d 168, 174–175, 5 OBR 351, 357–359, 450 N.E.2d 700, 707–709.

Moreover, even if the events could be viewed as sufficiently provocative under an *objective* standard in the case *sub judice*, defendant was not entitled to a voluntary manslaughter instruction as a matter of law since there is no evidence defendant *subjectively* acted under the influence of sudden passion or in a sudden fit of rage brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite defendant into using deadly force. *State v. Shane, supra*, 63 Ohio St.3d at 634, 590 N.E.2d at 276.

Defendant's own testimony did not support and completely undermined any claim that his actions were in fact incited by serious provocation. Defendant repeatedly testified he tried to avoid *any* fight with the victim and acted *solely* in self-defense "because all I was trying to do was protect myself." Defendant explained that he acted calmly and used the minimum force necessary to repulse the victim's alleged attack during the following colloquy:

"DEFENDANT: * * * I told him [the CMHA operator] that I used a knife during the fight. I also told him that it was in self-defense.

"[DEFENSE COUNSEL]: But what makes you think it's self-defense?

"A: Because if I did not use that knife, it was no way I could have got from his hands—out of the grasp of his hands. As he was choking me, I felt myself passing out. If I did not use that knife—I believe no—air was not getting into me. I believe that I was going to die.

"Q. Did he seem strong to you?

"A. Yes. I could not get out of his hands."

The record contains absolutely no testimony that defendant was under the influence of sudden passion or in a sudden fit of rage at any time during the incident. The record demonstrates that, unlike the facts in *Shane, supra*, defendant in the case *sub judice* did not state in his original telephone call to the police or in his subsequent testimony at trial that he was "provoked," "angry" or lost control of his temper at any time during the incident. *Id.*, 63 Ohio St.3d at 630, 590 N.E.2d at 273. Defendant's attempt to invoke the "some evidence" theory to support his contention that a voluntary manslaughter instruction was warranted in the case *sub judice* was specifically rejected by the *Shane* court as follows:

"To require an instruction to be given to the jury every time 'some evidence,' however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense. Trial judges are frequently required to decide what lesser included (or inferior-degree) offenses must go to the jury and which must not. The jury would be unduly confused if it had to consider the option of guilty on a lesser included (or inferior-degree) offense

when it could not reasonably return such a verdict." *Id.* at 633, 590 N.E.2d at 275.

Under the circumstances, based on our review of the record, no evidence was adduced at trial which would allow the jury to reasonably reject the greater offense of aggravated murder or murder and find defendant guilty of the lesser offense of voluntary manslaughter in the case *sub judice. Id.* at 632–633, 590 N.E.2d at 274–275; *State v. Williams* (Oct. 22, 1992), Cuyahoga App. No. 61080, unreported, at 12, 1992 WL 309373.

The Ohio Supreme Court was confronted with a situation similar to the case *sub judice* in *State v. Nolton* (1969), 19 Ohio St.2d 133, 48 O.O.2d 119, 249 N.E.2d 797. The *Nolton* court specifically recognized that instructions on lesser offenses may not be warranted in cases involving claims of self-defense, stating as follows:

"If in a criminal case the evidence adduced on behalf of the defense is such that if accepted by the trier of the facts it would constitute a complete defense to all substantive elements of the crime charged, the trier of fact will not be permitted to consider a lesser included offense." *Id.* at syllabus.

Under the circumstances, since defendant presented the complete defense of self-defense without any evidence from which a jury could reasonably find that serious provocation incited his actions, we find the reasoning of *Nolton* to be persuasive in the case *sub judice.* See *State v. King* (Nov. 18, 1993), Cuyahoga App. No. 62595, unreported, at 9, 1993 WL 483808.

Defendant has failed to exemplify any error concerning the trial court's instructions given the complete lack of evidence of serious provocation necessary to support a finding of voluntary manslaughter. The jury's rejection of defendant's claim of self-defense and finding that defendant "purposely" caused the victim's death demonstrates the jury was convinced defendant's actions were not justified in any way.

Accordingly, defendant's first assignment of error is overruled.

Defendant's second assignment of error follows:

"The court committed prejudicial error in allowing the appellant's grandmother, who did not testify as a character witness, to be questioned about her knowledge of prior arrests of the appellant for the purpose of impeaching character witness testimony."

Defendant's second assignment of error lacks merit.

Defendant contends the trial court improperly permitted the prosecution to cross-examine his grandmother concerning her knowledge of defendant's three prior arrests for (1) carrying a concealed weapon, (2) resisting arrest, and (3)

theft, which resulted in two misdemeanor convictions. However, based on our review of the record *sub judice,* defendant has failed to exemplify any error.

Defense counsel elicited the following testimony from defendant's grandmother during direct examination:

"[Defense Counsel]: Now can you tell us or can you describe for us what kind of person Germaine is, Miss Collins?

"A. Well, he is—I'm his grandmother. He don't bother nobody and he don't fight. People always want to fight him. They take his clothes at school. They jump on him, two and three of them. He got scars on his head, broke his jaw.

"Q. Who did all this ma'am?

"A. Kids in school, and he was scared to walk the streets.

"Q. Now it's your testimony that you never knew your grandson to be a troublemaker?

"A. Did I know my grandson to do what?

"Q. You never knew him to be a troublemaker?

"A. No."

The following colloquy occurred during the cross-examination of defendant's grandmother:

"[Prosecutor]: Now you indicated—you were asked a question by defense counsel as to what kind of boy your grandson was, and you said he was never a troublemaker?

"A. No.

"Q. He don't bother nobody?

"A. He don't bother nobody.

"Q. Were you aware, prior to expressing your opinion, that back on October 1st, 1990, that he had been arrested?

"[Defense Counsel]: Objection.

"[Prosecutor]: Can we approach the bench, Your Honor?

"THE COURT: Sure."

The trial court thereafter heard arguments from the parties outside the hearing of the jury concerning the propriety of questioning the witness concerning defendant's three prior arrests for (1) carrying a concealed weapon, (2) resisting arrest and (3) theft and two resulting misdemeanor convictions. The trial court continued the trial until the following morning to permit the parties to brief these issues.

The trial court concluded prior to commencement of trial the following day that such questioning was permissible based on the authority and arguments presented by the parties, stating in part as follows:

"THE COURT: * * * Now in this instance the Court has reviewed the law relating to the inference which was related here and the Court finds that under Evidence Rule 405, a character witness may be cross-examined as to the existence of reports of particular acts of an individual about whom testimony has been given, which are inconsistent with the reputation contributed [sic] to him by the witness.

"Such cross-examination is not done to establish the truth of the fact, but rather to test the credibility of the witness and ascertain weights or value to be given to that witness' testimony.

" * * *

"[Defense Counsel]: Your Honor, please note our exceptions. It's my understanding—it's my understanding also that the Court, under [Evidence] Rule 105, will give a limiting instruction to the jury.

"THE COURT: That's correct, Mr. Burke. I neglected to indicate that. You are one hundred percent correct. There will be a supporting limiting instruction to the jury."

The transcript demonstrates the prosecution thereafter questioned defendant's grandmother concerning these three arrests and two convictions.

The trial court delivered the following instruction to the jury concerning the limited use of the evidence of defendant's prior arrests and misdemeanor convictions at the conclusion of his grandmother's testimony:

"THE COURT: * * * At this point there is a matter that I want to call to your attention. I want you to consider it as it relates to the testimony of Miss Collins in this case. You will recall her testimony where she provided statements that her grandson was not a troublemaker. Then a series of questions were propounded to her by the prosecutor regarding certain criminal activity.

"Let me indicate to you the law is, it is perfectly permissible to cross-examine as to the existence of particular acts of an individual, about whom testimony has been given, which may be inconsistent with the reputation attributed to him by a witness.

"The cross-examination is not to establish the truth of these facts, but rather to test the credibility of the witness who testifies, and the weight that may be given to that testimony.

"Therefore, I instruct you that this is the purpose of that, and it's limited to that purpose. There is no other evidence or any of the rest of that, but only for

the credibility and weight you will give to that witness' testimony, and you are so instructed."

The trial court subsequently repeated this limiting instruction when delivering its final charge to the jury at the conclusion of the case.

The Tenth District Court of Appeals has recently applied Evid.R. 405 in this context and rejected defendant's precise argument under strikingly similar circumstances in *State v. Hart* (1991), 72 Ohio App.3d 92, 97–100, 593 N.E.2d 463, 466–468. Evid.R. 405(A) provides as follows:

"Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. *On cross-examination, inquiry is allowable into relevant specific instances of conduct.*" (Emphasis added.)

As in *Hart*, the record *sub judice* demonstrates the defense opened the door to this subject of inquiry by its witness stating an opinion during direct examination by defense counsel that defendant was not a "troublemaker." *Id.* at 97, 593 N.E.2d at 466. In each case the prosecution subsequently questioned the witness to determine whether the witness was aware of the defendant's prior arrests and whether knowledge of these prior arrests would change the witness's opinion concerning defendant's character. The record demonstrates that the trial court properly instructed the jury on two occasions concerning the limited use of this testimony and the jury is presumed to following such instructions. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph four of the syllabus.

Accordingly, defendant's second assignment of error is overruled.

*Judgment affirmed.*

JAMES D. SWEENEY, P.J., and PORTER, J., concur.