[Cite as *State v. Williams*, 2012-Ohio-1830.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 96813

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DARRELL WILLIAMS

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-538939

**BEFORE:**  Sweeney, J., Boyle, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**  April 26, 2012

**ATTORNEYS FOR APPELLANT**

David L. Grant, Esq.
Russell S. Bensing, Esq.
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: John Hanley, Esq.
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

**{¶1}** Defendant-appellant Darrell Williams ("defendant") appeals his convictions for one count of murder and three counts of attempted murder and his prison sentence of life with the possibility of parole after 32 years. After reviewing the facts of the case and pertinent law, we affirm.

**{¶2}** On June 13, 2010, defendant was in the E. 93rd Street and Union Avenue area of Cleveland attending "bike night," which is a social gathering for members of various motorcycle clubs. Defendant is a member of the Street Hustlers motorcycle club; there were also bikers there from other clubs such as the Sin City Deciples and the Mystic Knights. Outside of a bar, an argument broke out between two bikers. This argument eventually turned into a fight, which escalated to a melee involving several people. During the incident, defendant fired a gun killing Robert Mosby ("Grimy") and injuring Alfred Harrison ("Ty"), Darnell Milton ("L.Y.F.E."), and Kevin Bailey ("Ruthless").

**{¶3}** On July 7, 2010, defendant was charged with one count of aggravated murder and three counts of attempted murder. On March 19, 2011, a jury found defendant guilty of the lesser count of murder, as well as three counts of attempted murder, all with firearm specifications. On April 20, 2011, the court sentenced

defendant to life in prison with parole eligibility after 15 years for the murder; four, seven, and three years for the attempted murders; and three years for the firearm specifications, to run consecutively for an aggregate prison term of life with the possibility of parole after 32 years.

{¶4} Defendant appeals and raises four assignments of error for our review. The essence of defendant's arguments is that he acted in self-defense when he fired his gun, because Grimy was coming at him with a baseball bat. It is undisputed that defendant fired twice at Grimy, killing him when one of the bullets hit his heart. It is also undisputed that defendant fired his gun several more times. Baily took a bullet in the arm. Milton and Harrison sustained multiple gunshot wounds to the right and left leg, respectively.

I.

> The trial court erred, in derogation of Defendant's right to Due Process of Law as provided by the 14th Amendment to the United States Constitution, in excluding evidence of Robert Mosby's prior felony convictions, after the State had placed his character in issue.

{¶5} We review the admissibility of evidence under an abuse of discretion standard. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). Generally, evidence about a person's character is inadmissible with limited exceptions governed in part by Evid.R. 404 and 405. Pursuant to Evid.R. 404(A)(2),

> Evidence of a pertinent trait of character of the victim of the crime offered by the accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a

homicide case to rebut evidence that the victim was the first aggressor is admissible * * *.

{¶6} Character evidence may consist of "reputation or opinion" testimony in all applicable cases, and it may consist of "specific instances of conduct" only in cases "in which character or a trait of character of a person is an essential element of a charge, claim, or defense * * *." Evid.R. 405(A) and (B).

{¶7} In *State v. Barnes*, 94 Ohio St.3d 21, 23, 2002-Ohio-68, 759 N.E.2d 1240, the Ohio Supreme Court determined that, concerning an allegation of self-defense, "specific instances of a victim's prior conduct are not admissible to prove that a victim was the initial aggressor, regardless of defendant's knowledge." This is because the victim's character is not an essential element of a self-defense argument.

{¶8} In the instant case, the state presented the testimony of 20 witnesses during its case-in-chief. One of the witnesses testified that he was a member of Sin City Deciples and he knew Grimy. Asked by the prosecutor, "based on your relationship with [Grimy], how would you describe him as a person," this witness answered, "He was a good person."

{¶9} On cross-examination of this witness, the following colloquy took place:

Q.    Now, you indicated that your friend, Grimy, was a good guy?

A.    Yes.

Q.    Isn't that right?    He's a good guy?

A.    Yes.

Q.     Right?   Would it surprise you to know that he has seven –

       PROSECUTOR:     Objection * * *

Q.     — convictions * * *?"

{¶10}     Outside the presence of the jury, defense counsel argued that the State opened the door to Grimy's character, which afforded the defense the "right to go through his convictions to rebut [the] statement that he's a good guy."   In response, the court ruled as follows: "* * * I'm going to limit cross-examination on this issue as to whether or not the witness would change his opinion of [Grimy] being a good person if [the witness] knew that [Grimy] had prior felony convictions."

{¶11}     Upon further cross-examination, defense counsel asked, "Now, I believe you were asked a question relative to what kind of person Grimy * * * was, and I believe you said he was a good person * * *.   And would that opinion change if you knew he had felony convictions in any way?"   The witness answered, "No."

{¶12}     Upon review, we find that the admissible evidence about Grimy's character was limited to reputation or opinion testimony.   *See State v. Collins*, 97 Ohio App.3d 438, 450, 646 N.E.2d 1142 (8th Dist.1994) (finding no error when "the defense opened the door to this subject of inquiry by its witness stating an opinion during direct examination by defense counsel that defendant was not a 'troublemaker' [and] the prosecution subsequently questioned the witness to determine whether the witness was

aware of the defendant's prior arrests and whether knowledge of these prior arrests would change the witness's opinion concerning defendant's character").

{¶13} The court acted within its discretion in limiting the evidence regarding Grimy's prior felony convictions and defendant's first assignment of error is overruled.

{¶14}  In defendant's second assignment of error, he argues as follows:

## II.

The trial court erred, in derogation of Defendant's right to Due Process of Law as provided by the 14th Amendment to the United States Constitution, in excluding corroborating testimony of Defendant's observation of prior instances of the decedent's violent conduct.

{¶15}  In *State v. Spinks*, 79 Ohio App.3d 720, 607 N.E.2d 1130 (8th Dist.1992), this court held the following:

A defendant, when arguing self-defense, may testify about specific instances of the victim's prior conduct which were known to the defendant in order to establish the defendant's state of mind. * * * [T]he trial court afforded appellant great leeway in testifying to matters of past violent incidents between appellant and the decedent.  In fact, appellant testified to the decedent's violent past with his ex-wife.  This was entirely permissible. * * * *However, corroborating evidence of the victim's character*, offered to substantiate her testimony, * * * a police report of a domestic violence incident, and a divorce complaint and affidavit filed by decedent's ex-wife *was properly excluded.  Id.* at 730 (internal citations omitted; emphasis added).

{¶16}  This court has also held that corroborating testimony of this type is properly excluded as cumulative.  *Cleveland v. Hill*, 63 Ohio App.3d 194, 198, 578 N.E.2d 509 (1989), stands for the proposition that because "defendant was allowed to relate other specific acts of aggression committed by the vicitm * * *," the admission of corroborating hospital records "would not have tended to prove anything more than that testified to by defendant and the victim."

**{¶17}**    Other Ohio courts have adopted this reasoning.    In *State v. Weston*, 4th Dist. No. 97CA31, 1999 WL 552732 (July 16, 1999), the court stated the following:

> [T]he holding in *Cleveland v. Hill* (1989), 63 Ohio App.3d 194, 198, 578 N.E.2d 509, where the introduction of such corroborative, or extrinsic, evidence of "prior bad acts" was excluded as cumulative * * * is precisely correct since evidence of the victim's specific "prior bad acts" has already been admitted into evidence by the uncontroverted testimony of the appellant.

*See, also, State v. Eng*, 2nd Dist. No. 14015, 1994 WL 543277, (Sept. 30, 1994) (holding that "[e]vidence however which merely corroborates a defendant's testimony as to the victim's violent character may properly be excluded").

**{¶18}**    In the instant case, defendant testified that he had seen Grimy cut a man in the face with a knife.    The court excluded testimony from the alleged victim of that incident, who would have corroborated defendant's testimony.    We find that, under the authority of *Spinks* and *Hill*, the court acted within its discretion, and defendant's second assignment of error is overruled.

**{¶19}**    Defendant's third assignment of error states the following:

**{¶20}**    III.    "The Defendant's convictions of murder and attempted murder are against the manifest weight of the evidence."

**{¶21}**    To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage

of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶22}** To prove self-defense, the following must be shown: 1) the defendant "was not at fault in creating the situation"; 2) the defendant had a "bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force"; and 3) the defendant "must not have violated any duty to retreat or avoid the danger." *State v. Melchior*, 56 Ohio St.2d 15, 20-21, 381 N.E.2d 195 (1978) (internal citations omitted).

**{¶23}** Defendant argues that the eyewitness testimony against him "was rife with inconsistencies and contradictions," and that it was not credible because of the witnesses' criminal records. Our review of the trial testimony shows that several members of motorcycle clubs testified for the prosecution as eyewitnesses to the incident at bike night. At least four of them had been convicted of felonies, and two of them testified while wearing prison garb.

**{¶24}** The testimony was consistent that the street fight on June 13, 2010 started as an argument between Roy Levy ("Choir Boy"), who was a member of the Sin City Deciples at the time, and Lamaur Dennis ("Nephew"), who is a member of the Mystic Knights. The disagreement was personal, and in general, there was no bad blood between the two clubs. There is no evidence in the record that defendant was involved in starting the fight.

**{¶25}** Additionally, the testimony was consistent that the incident took place alongside a double fence — one wooden and one chain-linked. Defendant testified that he was backed up against this fence and nothing in the record contradicts this. Assuming for the sake of argument that defendant has met the first and third elements of self-defense, we focus our analysis on the second element, whether defendant believed "he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force."

**{¶26}** Douglas Watson ("Fresh") testified that he is a member of the Sin City Deciples, which is the motorcycle club that Grimy belonged to. Fresh did not see a bat or anything else in Grimy's hand during the street fight. L.Y.F.E. testified that he is a member of the Sin City Deciples, and he did not see a weapon or anything else in Grimy's hands that night. Roy Levy ("Choir Boy") testified that he is a former member of the Sin City Deciples, and he did not see Grimy or anyone else with a bat that night, although the police found a blue and black aluminum bat in his trunk.

**{¶27}** George William Hannett ("Geo") testified that he is a member of the Sin City Deciples, and he saw Grimy with a small, wooden bat, approximately 6" to 8" in length, in his hand during the fight. According to Geo, this object was kept on Grimy's keychain.

**{¶28}** Raymel Ryan ("Ray-Ray"), who, along with defendant, is a member of the Street Hustlers motorcycle club, also testified for the prosecution. He saw Grimy

coming across the street with a black baseball bat in his hand. Ray-Ray heard defendant say, "Grimy, don't hit nobody with the bat." However, Grimy raised the bat to swing and kept approaching. Grimy was close enough to hit defendant when defendant fired his gun.

{¶29} Three motorcycle club members who witnessed the incident testified for defendant. John Jones ("Stroke") testified that he is a member of the Mystic Knights motorcycle club, and he saw Grimy with an aluminum baseball bat during the fight. Grimy was swinging the bat towards a group of people when somebody yelled, "Put the bat down." Grimy swung the bat again, and Stroke heard gunshots. Stroke saw Grimy go down with the bat in his hand after being hit by a bullet. Stroke did not see defendant in the vicinity where Grimy was swinging.

{¶30} Robert Dunn ("Big Daddy") testified that he is a member of the Mystic Knights, and he saw Grimy cross the steeet with a metal bat in his hand. Grimy raised it up in the air, and then Big Daddy heard gunshots. When Grimy raised the bat, defendant was not near him.

{¶31} Lamaur Dennis ("Nephew") testified that he is a member of the Mystic Knights, and he saw Grimy run across the street with an aluminum bat. Nephew heard gunshots, then saw Grimy fall to the ground with the bat in his hand. Nephew did not see Grimy raise or swing the bat, and he did not see where defendant was during the fight.

{¶32}   Defendant testified that he was in the middle of the street fight when he saw Grimy standing approximately ten feet in front of him holding an aluminum bat up in the air.   Defendant said, "Grimy, put the bat down," three times.   However, Grimy kept approaching.   Defendant testified as follows:

&ast; &ast; &ast; [Grimy] made another step or two towards me with the bat up, and it started coming down.   And I reached for my pistol.

Q:   What did you do with your pistol?

A:   I pointed it in his direction.   I fired.

Q:   Okay.   Why did you fire at him?

A:   I was in fear of my life.

Q:   Why were you in fear of your life?

A:   Because he was gonna' hit me with a bat. &ast; &ast; &ast; Because about a year before that I saw Grimy get to fighting right in the same place, right on the sidewalk of Fresh.   And he pulled out a knife and cut a guy across the left side of his face.

&ast; &ast; &ast;

Q:   Okay.   So you had seen him engage in violence with a knife before?

A:   Yes.

Q:   Okay.   And how far was the bat from you when you shot him?

A:   Approximately six feet.

Q:   And how, in what manner was he carrying the bat?

A:   At the time he was swinging on me?

Q:     Yes.

A:     He was coming down with it.

Q:     Okay.   And how many times did you shoot him?

A:     Twice.

* * *

Q:     As he charged you with the bat, why didn't you run?

A:     There was no where to go.   My back was against — I was right by the fence and the north corner of [a building].   If I stuck my right hand out, I'd have been by the fence.   If I stuck my left hand out, I'd have been by the wall, right on the edge.   There was people to the right of it, people to the left of it, and he was standing right in front of me, coming at me with the bat.

Q:     Did you feel you had any alternative but to shoot him?

A:     No.   That's all I could do to keep him from killing me.

**{¶33}**   To summarize the evidence in the instant case, three Sin City Deciples did not see anything in Grimy's hands during the fight.   One Sin City Deciple saw Grimy with a miniature bat.   Grimy was a member of the Sin City Deciple motorcycle club.

**{¶34}**   One member of the Street Hustlers saw Grimy swinging a bat close enough to hit defendant when defendant shot Grimy.   Defendant is a member of the Street Hustlers motorcycle club.

**{¶35}**   Three members of the Mystic Knights saw Grimy with a bat in his hand during the fight.   However, none of them saw defendant near Grimy.

{¶36}     Defendant testified that he feared for his life and he had nowhere to run. Defendant also testified about what he knew of Grimy's violent character.

{¶37}     Our review of this testimony shows that the jury did not lose its way in finding that the defendant did not act in self-defense when he fired his gun.   Defendant and one member of his motorcycle club testified that Grimy was swinging a bat at defendant.   However, seven other witnesses' testimony contradicted this.   In resolving this evidentiary conflict, it is reasonable for the trier of fact to find that defendant did not believe his life was in danger when he fatally shot Grimy and injured three other people.

{¶38}   We find that the weight of the evidence supports defendant's convictions for murder and attempted murder, and his third assignment of error is overruled.

{¶39}     In defendant's fourth and final assignment of error, he argues that:

IV.

The trial court abused its discretion in sentencing Defendant to consecutive terms of imprisonment totaling 34 [sic] years.

{¶40}     he Ohio Supreme Court set forth the standard for reviewing felony sentencing in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124.   *See also State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470; *State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320, 941 N.E.2d 768.   *Kalish*, in a plurality decision, holds that appellate courts must apply a two-step approach when analyzing alleged error in a trial court's sentencing.

First, they must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision shall be reviewed under an abuse-of-discretion standard. *Id.* at ¶4, 845 N.E.2d 470.

**{¶41}** In addition to determining the length of a prison sentence for each conviction, courts have the discretion to determine whether prison sentences are to be served consecutively or concurrently. *See State v. Bates*, 118 Ohio St.3d 174, 2008-Ohio-1983, 887 N.E.2d 328.

**{¶42}** In the instant case, the court imposed a mandatory sentence of life in prison with the possibility of parole after 15 years for defendant's murder conviction. Defendant does not argue that this was improper. Rather, defendant challenges "the sentences imposed on the attempted murder charges, and the decision to run them consecutively." Although defendant alleges that this was both contrary to law and an abuse of discretion, his argument concerns only whether the court abused its discretion.

**{¶43}** Attempted murder is a first degree felony punishable by a prison sentence of between three and ten years. R.C. 2903.02(A), 2923.02, and 2929.14(A)(1). The court sentenced defendant to seven years, four years, and three years in prison for the three counts of attempted murder. These sentences are within the statutory range and are not contrary to law.

**{¶44}** Furthermore, in running these sentences consecutively, the court found that "[e]ach count represents a separate victim * * * and the defendant * * * shot

numerous times at the different individuals."   The court also found that the shooting was a

> horrendous, senseless act * * * all because of one argument, * * * an argument between two men who you didn't even seem to really know, who didn't really know you * * *.   And to me, it just seems so senseless that just in a matter of seconds so much has * * * been lost and is lost forever.

**{¶45}**   The court stated that of the attempted murder offenses, one victim "was seriously injured, having his leg shattered, and another one * * * was shot twice. * * * To me, it seems that the three other people who were shot were pretty much at the wrong place at the wrong time."   Additionally, the court stated that it considered "the purposes and principles of felony sentencing, Revised Code 2929.11 and the seriousness and recidivism factors in 2929.12."

**{¶46}** Upon review, we find nothing in the record to suggest that defendant's sentence is unreasonable, arbitrary, or unconscionable.   The court acted within its discretion when it ordered defendant to serve his sentences consecutively, and his fourth assignment of error is overruled.

**{¶47}**   Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the   Common Pleas Court to carry this judgment into execution.   The defendant's conviction having

been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

JAMES J. SWEENEY, JUDGE

MARY J. BOYLE, P.J., and
SEAN C. GALLAGHER, J., CONCUR