OPINION
{¶ 1} Defendant-appellant, Conswella D. Lee, appeals from a judgment of the Franklin County Court of Common Pleas convicting her of murder and tampering with evidence and sentencing her accordingly. For the following reasons, we affirm the judgment of the trial court.
 {¶ 2} This case arises from the stabbing death of David Skeaton, the decedent, on Thanksgiving Day, November 28, 2002, in Mr. Skeaton's home on Hilltonia Avenue in Columbus. Defendant does not dispute that she caused the death of Mr. Skeaton.
 {¶ 3} Decedent's son, Shawn Smith, testified that, as of November 28, 2002, he had been living with his father, Mr. Skeaton, at 639 Hilltonia Avenue in Columbus, for six years. According to Mr. Smith, defendant had lived at his father's home "off and on for two or three years," and was living with his father on November 28, 2002. (Tr. 36-37.) Mr. Smith testified that defendant and Mr. Skeaton had argued once or twice and had gotten into a physical confrontation once. (Tr. 44.) According to Mr. Smith, when he saw defendant at Mr. Skeaton's home, defendant was drinking alcohol "every time," and when he saw her drinking, she was intoxicated "maybe half the times." (Tr. 45-46.)
 {¶ 4} Mr. Smith testified that on November 28, 2002, neither he nor his father had to go to work. At 11:30 a.m. that day, Mr. Smith was leaving his father's home. As he was leaving the home, Mr. Smith saw Mr. Skeaton, defendant, and John Ellison drinking as a group, but he did not notice if all three were drinking individually. (Tr. 39.) Mr. Smith left the home, and returned in the evening. When Mr. Smith returned to the home, he noticed his father face down on the living room floor. He also noticed that the couch and speakers were turned over. He initially thought that his father was sleeping. No one else was in the home. Mr. Smith went into the kitchen to place food in the refrigerator. When he returned to the living room, he discovered blood on his father and called 911.
 {¶ 5} John Ellison testified that he and Mr. Skeaton were friends. On November 28, 2002, Mr. Ellison went to Mr. Skeaton's house around 9:15 or 9:20 a.m. Defendant was with Mr. Skeaton at the home. Mr. Ellison testified that he, defendant, and Mr. Skeaton were socializing and drinking beer in the morning. At about 12:30 p.m., Mr. Ellison left Mr. Skeaton's home. Around 1 p.m., Mr. Skeaton and defendant went to Mr. Ellison's home. According to Mr. Ellison, they watched football games and drank alcohol. Mr. Ellison testified that defendant and Mr. Skeaton were "constantly having disagreements," and that he did not witness any arguments between the two on the day of Mr. Skeaton's death. (Tr. 71.) Mr. Skeaton, defendant, and Mr. Ellison left Mr. Ellison's home around 6 p.m. in Mr. Skeaton's car, and Mr. Skeaton dropped off Mr. Ellison at Eakin Road.
 {¶ 6} Sue Hall was working at the "`C' Town Food Mart," on 1975 West Mound Street on November 28, 2002. According to Ms. Hall, defendant had entered the store earlier and purchased cigarettes and left in a car that Ms. Hall identified as Mr. Skeaton's. Ms. Hall testified that defendant seemed upset and was screaming when she left the store. (Tr. 77.)
 {¶ 7} Columbus Police Detective Steve Eppert was assigned to create a description of the homicide scene. He testified that blood was found primarily in the living room, but some blood splatters were discovered in the dining room area. (Tr. 86.) He also testified that a knife was found in a floor vent in the dining room. Columbus Police Detective William Miller testified that no fingerprints of value were found on the knife. (Tr. 123.)
 {¶ 8} Columbus Police Detective James Porter, the primary investigator of the homicide, testified that he and defendant had a face-to-face conversation regarding the death of Mr. Skeaton several days after the homicide. Detective Porter testified as follows:
Q. [By prosecutor] When you were talking face to face with Ms. Lee, what did she tell you about her involvement?
A. She admitted that she had been responsible for the death of Mr. Skeaton.
Q. How did she tell you that?
A. She stated that she had stabbed him.
Q. Did she say why?
A. She stated that it happened during an argument at Mr. Skeaton's home.
Q. And did she say why they were arguing in Mr. Skeaton's home.
A. Yes. She stated that the argument began upstairs and had carried on to the downstairs into the kitchen through the dining room and then finally into the living room.
Q. Did she tell you at what point the argument became physical?
A. Yes. She stated that it was physical almost from the very beginning.
Q. Upstairs?
A. Well, she left upstairs and began to go downstairs and that's when it became physical.
Q. Did she tell you when she started stabbing Mr. Skeaton, and did she tell you where that occurred?
A. She stated initially that she picked up the knife in the kitchen and Mr. Skeaton came at her and that's when she stated she stabbed him in the kitchen and it went through into the dining room and then finally into the living room.
Q. Did she ever tell you how many times she stabbed him?
A. No. She stated that the first stabbing occurred in the kitchen area and then she did not recall how many times she stabbed him after that.
(Tr. 130-131.) According to Detective Porter, defendant also stated that she dropped the knife into or near a register in the dining room. (Tr. 131.) Detective Porter testified that he did not observe any signs that defendant had been injured in the fight, and defendant did not point out any injuries she suffered in the fight. (Tr. 132-133.)
 {¶ 9} Dr. Patrick Fardal performed an autopsy on Mr. Skeaton. According to Dr. Fardal, Mr. Skeaton's blood alcohol level at the time of death was "0.24 grams percent." (Tr. 160.) Dr. Fardal stated that Mr. Skeaton "would have been impaired to a considerable extent" from this alcohol. (Tr. 161.) Dr. Fardal also testified that Mr. Skeaton died from "[m]ultiple stab wounds, the major one causing the injury to his heart and his left lung, and one to the chest, and there was one to the abdomen causing an injury to the liver." (Tr. 159.) Dr. Fardal added, "The wound to the heart was the fatal injury, but the second injury could have been fatal if the patient had not received medical care, but the fatal injury was to the heart, left lung." Id. In total, Mr. Skeaton had 11 "sharp instrument wounds" to different parts of his body. (Tr. 193.)
 {¶ 10} Defendant testified at trial. She testified that she had gone to Mr. Ellison's home on November 28, 2002, and that Mr. Skeaton was with her at Mr. Ellison's home. According to defendant, Mr. Skeaton touched her inappropriately at Mr. Ellison's home, and she was embarrassed by this behavior. (Tr. 201.) In the early evening, defendant and Mr. Skeaton left Mr. Ellison's home and went to Mr. Skeaton's home. When they arrived at the home, defendant went upstairs to pack a bag and Mr. Skeaton went to the kitchen. Defendant testified that Mr. Skeaton started to argue with her, and that he threw her on the bed and attempted to have sex with her. Defendant testified that she "was able to get out from under him and get out of the room," and that she ran downstairs. (Tr. 202.) According to defendant, Mr. Skeaton was "right behind [her]," and was "cussing [her] out." (Tr. 203.) When she was asked what she thought defendant was going to do to her, defendant responded, "I thought he was going to kill me." Id.
 {¶ 11} Defendant attempted to leave through the front door, but it was locked. Id. Defendant testified that Mr. Skeaton pulled her away from the door, that she ran into the kitchen and grabbed a knife because she "thought he would back off [her]." (Tr. 203-204.) Defendant also testified that Mr. Skeaton began to choke her, and she felt that she was going to die. (Tr. 206.) Defendant testified that she did not "remember actually stabbing him" but that Mr. Skeaton stopped choking her after he fell to the floor. Id. After Mr. Skeaton fell, defendant "walked around him and put the knife in the vent." Id.
 {¶ 12} Defendant's counsel did not request a jury instruction on voluntary manslaughter, and the court did not instruct the jury on voluntary manslaughter. The court did instruct the jury on the offense of murder, the affirmative defense of self-defense, and the offense of tampering with evidence.
 {¶ 13} The jury found defendant guilty of murder and tampering with evidence. The trial court sentenced defendant accordingly. Defendant appeals, and assigns the following errors:
I. The trial court committed plain error when it failed to instruct the jury on the offense of voluntary manslaughter.
II. The defendant was denied her sixth amendment right to counsel because counsel was ineffective by failing to request a jury instruction on voluntary manslaughter.
 {¶ 14} By her first assignment of error, defendant asserts that the trial court committed plain error by not instructing the jury on the offense of voluntary manslaughter. Counsel for defendant failed to request a jury instruction on voluntary manslaughter and failed to object to the jury instructions given to the jury, as required under Crim.R. 30, in order to assign error on appeal regarding the jury instructions. Thus, defendant has waived all but plain error in this regard.
 {¶ 15} Ohio's voluntary manslaughter statute, R.C. 2903.03, provides as follows:
(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
(B) Whoever violates this section is guilty of voluntary manslaughter, a felony of the first degree.
 {¶ 16} The Supreme Court of Ohio has outlined the burden on a defendant regarding voluntary manslaughter as follows:
A defendant on trial for murder or aggravated murder bears the burden of persuading the fact finder, by a preponderance of the evidence, that he or she acted under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, R.C. 2903.03(A), in order for the defendant to be convicted of voluntary manslaughter rather than murder or aggravated murder.
State v. Rhodes (1992), 63 Ohio St.3d 613, at syllabus.
 {¶ 17} Voluntary manslaughter is an inferior degree of murder, as "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements."State v. Shane (1992), 63 Ohio St.3d 630, 632. A jury instruction on voluntary manslaughter is not mandated in all aggravated murder or murder prosecutions. See id.
* * * Even though voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought.
Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter.
(Citations omitted.) Id.
 {¶ 18} Additionally, the Supreme Court of Ohio has stated that "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." State v. Mack (1998), 82 Ohio St.3d 198, 201. "Self-defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage." State v. Thompson (Feb. 23, 1993), Franklin App. No. 92AP-1124.
 {¶ 19} In the case at bar, the evidence did not support an instruction on voluntary manslaughter, even though defendant testified as to her fear. Defendant's testimony provided no evidence that she acted under the influence of sudden passion or in a sudden fit of rage. Defendant testified that she had been embarrassed by inappropriate touching by Mr. Skeaton. Defendant stated that she thought Mr. Skeaton was going to kill her. Defendant testified that she grabbed the knife because she "thought he would back off [her]." (Tr. 204.) That is, she grabbed the knife "to protect herself." Id. Defendant testified that she thought she was going to die when Mr. Skeaton was choking her. The above testimony supported a jury instruction on self-defense. However, we find that the evidence at trial was insufficient for the jury to reasonably find that defendant was under the influence of sudden passion or in a sudden fit of rage at the time of the homicide. Thus, the trial court did not err in not instructing the jury on voluntary manslaughter. Accordingly, we overrule defendant's first assignment of error.
 {¶ 20} By her second assignment of error, defendant asserts that she received ineffective assistance of counsel because her trial counsel did not request a jury instruction on voluntary manslaughter. In order to establish ineffective assistance of counsel, defendant must meet the two-part test outlined inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. First, defendant must demonstrate that his trial counsel's performance was deficient. Namely, defendant must show "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. A court reviewing an ineffective assistance of counsel claim must determine whether, under the circumstances, the acts or omissions were "outside the wide range of professionally competent assistance." Id. at 690.
 {¶ 21} Second, in order for defendant to establish ineffective assistance of trial counsel, defendant must demonstrate that the deficient performance prejudiced defendant. This requires defendant to show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
 {¶ 22} In the case at bar, defendant's trial counsel did not request a jury instruction on voluntary manslaughter. The Supreme Court of Ohio has stated that the "[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." State v. Griffie (1996), 74 Ohio St.3d 332, 333, citing State v. Clayton (1980), 62 Ohio St.2d 45, certiorari denied (1980), 449 U.S. 879, 101 S.Ct. 227. We recognize that voluntary manslaughter is not a lesser included offense of murder. However, the test for whether a judge should give an instruction on voluntary manslaughter is the same test to be applied as when an instruction on a lesser included offense is sought. Shane, at 632. Therefore, trial counsel's decision not to request a jury instruction on voluntary manslaughter could be considered a matter of trial strategy.
 {¶ 23} Additionally, trial counsel was not deficient in not requesting a jury instruction on voluntary manslaughter, considering that evidence at trial did not support a finding that defendant acted under the influence of sudden passion or in a sudden fit of rage. Stated differently, because we have found that the trial court did not err when it did not instruct the jury on voluntary manslaughter, we cannot find that defendant's trial counsel's failure to request an instruction on voluntary manslaughter amounted to ineffective assistance of counsel.State v. Steele, Cuyahoga App. No. 83388, 2004-Ohio-4628.
 {¶ 24} Based on the foregoing, we find that defendant's trial counsel was not deficient in not requesting a jury instruction on voluntary manslaughter. Therefore, we overrule defendant's second assignment of error.
 {¶ 25} For the foregoing reasons, both of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
French and Deshler, JJ., concur.
DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.