OPINION
{¶ 1} This is an appeal by defendant-appellant, Dominique Bridgewater, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas, following a jury trial in which appellant was found guilty of murder.
 {¶ 2} On November 8, 2006, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, with an accompanying firearm specification pursuant *Page 2 
to R.C. 2941.145. The indictment arose out of the shooting death of Jason Bucknor on October 13, 2006.
 {¶ 3} The case came for trial before a jury beginning June 4, 2007. The state presented the following evidence during its case-in-chief. In October 2006, Jason Bucknor ("Bucknor") resided at 117 Pinewood Drive, Whitehall, with his girlfriend, Tammy Boyd. Also living at Bucknor's residence at that time was Steven Ferrell. Bucknor and Ferrell became acquainted with each as a result of drug use. Bucknor was acquainted with appellant, a drug dealer, having bought drugs from him in the past. Appellant's nickname was "D'Nice." (Tr. Vol. II, at 26.)
 {¶ 4} On October 13, 2006, Bucknor was at his residence when he told Ferrell, who lived in the basement, to come upstairs because "D was coming over there." (Tr. Vol. I, at 62.) Bucknor informed Ferrell that he was going to "rip him [appellant] off" of some crack cocaine. (Tr. Vol. I, at 62.) Ferrell testified that he was "against the thing all along." (Tr. Vol. I, at 62.) At approximately 4:00 p.m., appellant arrived at Bucknor's residence, and Bucknor went out to appellant's car. A short time later, appellant followed Bucknor into his residence. Ferrell testified that Bucknor began yelling at appellant and, at one point, Bucknor "had a knife up to his throat threatening." (Tr. Vol. I, at 65.) Ferrell did not observe Bucknor with a firearm that day.
 {¶ 5} Bucknor informed appellant he was not going to pay him for the drugs he brought to the house. Appellant then went running out to his car, and Bucknor also ran out toward the car. Approximately ten to fifteen seconds later, Bucknor came running into the house and told Ferrell to run over to the residence of a neighbor, Faith Bliss. Bucknor *Page 3 
then went out the back sliding door and ran to Bliss's residence. According to Ferrell, Bucknor appeared scared.
 {¶ 6} Ferrell got up from the couch and began following Bucknor. As he was running to Bliss's house, he noticed appellant running up behind him. Ferrell became scared, however, so he returned to Bucknor's house, while appellant continued toward Bliss's residence. Approximately five seconds after Ferrell returned to Bucknor's house, he heard a gunshot.
 {¶ 7} In October 2006, Bliss resided at 113 Pinewood Drive, located next door to Bucknor's residence. At trial, Bliss admitted to having previously used crack cocaine with Bucknor and Boyd. On October 13, 2006, Bliss was at home when Boyd came to the front door and knocked. Boyd appeared "frantic," and stated to Bliss, "I'm not dealing with this." (Tr. Vol. I, at 117.) A short time later, Bucknor was at Bliss's back sliding glass door. Bliss let Bucknor inside and shut the door. Bucknor was out of breath, "frantic." (Tr. Vol. I, at 118.) Bliss did not observe any knife in Bucknor's hand, nor did she observe Bucknor with a firearm. According to Bliss, "[w]ithin seconds, D'Nice was there and he shot him." (Tr. Vol. I, at 117.) Specifically, Bliss observed D'Nice raise a gun and shoot Bucknor in the chest. The shot shattered the sliding glass door, and Bucknor fell back against the wall. Bliss received cuts from the shattered glass.
 {¶ 8} Bliss immediately called 911. While she was on the phone, Boyd came to her with "crack to hide," and Bliss hid the drugs under her bed before police officers arrived. (Tr. Vol. I, at 122.)
 {¶ 9} Bliss was acquainted with appellant, having bought cocaine from him on several prior occasions, and she knew his full name as Dominique Bridgewater. Later *Page 4 
that day, Bliss was taken to the police station and she provided officers with a statement. Officers showed Bliss a photograph, and she identified that individual as appellant. At the police station, Bliss told the police officers about the drugs she had hidden.
 {¶ 10} Whitehall police officers conducted a search of both 113 Pinewood Drive and 117 Pinewood Drive. No weapons were found at either residence. A warrant was issued for appellant's arrest on the date of the incident, but he was not arrested until October 31, 2006, after police detectives received a tip that he was staying at a motel.
 {¶ 11} Dr. Tae An, of the Franklin County Coroner's Office, conducted an autopsy of Bucknor on October 14, 2006. Dr. An testified that the cause of Bucknor's death was a single gunshot wound to the chest, lacerating the victim's subclavian vein and left lung.
 {¶ 12} The sole witness for the defense was appellant, who gave the following testimony. Appellant, age 19, acknowledged that he sold drugs, and that he had previously met Bucknor as a result of drug sales. On the morning of October 13, 2006, appellant was at court attending a pre-sentence investigation regarding a charge of carrying a concealed weapon. According to appellant, he had been carrying a weapon because he had been previously shot.
 {¶ 13} Later that day, Bucknor called appellant, stating that he wanted to purchase $100 worth of crack cocaine. Around 4:00 p.m., appellant arrived at Bucknor's residence. Appellant was driving a white Ford Taurus, and he had a .357 revolver in the car. When he entered Bucknor's residence, Bucknor's girlfriend, Boyd, got up from a couch and walked out of the room "like she had an attitude." (Tr. Vol. II, at 42.)
 {¶ 14} After Boyd left, appellant followed Bucknor into the bathroom, and appellant pulled out a bag of crack, separating out what he calculated to be an amount worth $100. *Page 5 
Appellant put the crack in Bucknor's hand, and Bucknor placed the drug in his pocket. Bucknor, however, then snatched the rest of the crack appellant had brought. According to appellant, Bucknor then "took off his shirt and revealed a gun that was on his waistline." (Tr. Vol. II, at 46.) Appellant was shocked, and Bucknor told him "he was doing this because I robbed grandpa or I ripped off grandpa." (Tr. Vol. II, at 46.) Appellant responded that he did not know what Bucknor was talking about.
 {¶ 15} Bucknor then demanded money from appellant, and appellant complied. Bucknor walked out of the bathroom, and Ferrell was sitting in the living room on a couch. Bucknor then pulled the gun out of his waistband and began yelling at appellant. He eventually pushed appellant out the door. According to appellant, Bucknor was no longer holding the gun at the door.
 {¶ 16} Appellant began walking toward his car. As appellant approached the passenger door, near where his weapon was hidden, Bucknor came outside and told him to leave his property, stating that "he was going to kill me, and he ran back in the house." (Tr. Vol. II, at 53.)
 {¶ 17} Appellant then grabbed his weapon and ran to the front of Bucknor's house because "I thought Jason was going to grab the gun and come back to the door and see that I wasn't gone off his property." (Tr. Vol. II, at 55.) Appellant explained he did not start the car and drive away because "the car had difficulties starting. It was an older car." (Tr. Vol. II, at 55.)
 {¶ 18} Appellant then went next door "[b]ecause I was desperate for help and I was scared that Jason was going to come after me, shooting." (Tr. Vol. II, at 55.) Appellant began running, but then walked "to Faith's backyard where the gate was *Page 6 
opened[.]" (Tr. Vol. II, at 57.) Appellant observed Ferrell walking through Bucknor's backyard, but Ferrell saw appellant and turned around. Appellant then went to Bliss's back door. To appellant's "surprise, Jason was standing right there at the back door right beside Faith." (Tr. Vol. II, at 58.) Appellant testified that, when he got to the door, "at first I went to open it, and then I looked up and Jason had his gun raised at me." (Tr. Vol. II, at 59.) Appellant testified, "I covered my face and I turned my back towards Jason, and while I was doing that all in one motion, I pulled out my gun and shot one time through the glass." (Tr. Vol. II, at 60.) Appellant then fled the scene.
 {¶ 19} After learning through news reports that Bucknor was dead, appellant hid at the homes of friends. Appellant denied that he ever intended to leave the Columbus area, and explained that he did not turn himself in because "I was scared that this man was dead and I was being charged with murder." (Tr. Vol. II, at 64.) On cross-examination, appellant testified he had been selling drugs for one and one-half years.
 {¶ 20} The trial court provided jury instructions on aggravated murder and murder, as well as on the firearm specification. The court also provided an instruction on self-defense. Defense counsel did not request a jury instruction on voluntary manslaughter, nor did the court provide such an instruction.
 {¶ 21} Following deliberations, the jury returned verdicts finding appellant guilty of murder, as the lesser-included offense of Count 1. By judgment entry filed on June 8, 2007, the trial court imposed a sentence of 15 years to life on the murder charge, and an additional three-year consecutive sentence on the firearm specification.
 {¶ 22} On appeal, appellant sets forth the following three assignments of error for this court's review: *Page 7 
 FIRST ASSIGNMENT OF ERROR:
 The Court of Common Pleas erred when it failed in its duty to instruct the jury on the inferior offense of voluntary manslaughter.
 SECOND ASSIGNMENT OF ERROR:
 Trial counsel rendered ineffective assistance of counsel when they failed to request that the trial court instruct on the inferior offense of voluntary manslaughter.
 THIRD ASSIGNMENT OF ERROR:
 The trial court erred in entering the judgment of conviction for Murder because that conviction is against the manifest weight of the evidence.
 {¶ 23} Under his first assignment of error, appellant argues the trial court erred in failing to instruct the jury on the inferior offense of voluntary manslaughter. Appellant contends that defense counsel presented evidence of the mitigating circumstance of extreme emotional distress, thus warranting a voluntary manslaughter instruction. Specifically, appellant asserts there was evidence showing that Bucknor threatened him with a weapon, either a knife or a gun, robbed him of money, and provoked him to use deadly force.
 {¶ 24} As noted under the facts, appellant did not request an instruction on voluntary manslaughter at trial, and, therefore, this court's review is under the plain error standard. Plain error is error that involves an "obvious defect in the trial proceedings," and such error "must have affected the outcome of the trial." State v.Barnes (2002), 94 Ohio St.3d 21, 27. *Page 8 
 {¶ 25} Voluntary manslaughter is defined under R.C. 2903.03(A) as follows:
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
 {¶ 26} Under Ohio law, "[a] defendant charged with aggravated murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the aggravated murder charge and a conviction of voluntary manslaughter." State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, at ¶ 130. Prior to giving an instruction on voluntary manslaughter in a murder case, "the trial court must determine `whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction.'" State v. Elmore,111 Ohio St.3d 515, 2006-Ohio-6207, at ¶ 81, quoting State v. Shane (1992),63 Ohio St.3d 630.
 {¶ 27} An objective standard is first applied "to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage." State v. Mack (1998), 82 Ohio St.3d 198, 201. In order "`[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" Elmore, supra, at ¶ 81, quoting Shane, supra, at 635. If the objective standard is met, the inquiry then shifts to a subjective standard "to determine whether the defendant in the particular case `actually was under the influence of sudden passion or in a sudden fit of rage.'" Mack, supra, at 201, quoting Shane, supra, at 634-635. *Page 9 
 {¶ 28} Under Ohio law, "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." Mack, supra, at 201. Further, "this court has held that evidence supporting the privilege of self-defense, i.e., that the defendant feared for his own and other's personal safety, does not constitute sudden passion or fit of rage as contemplated by the voluntary manslaughter statute." State v. Harris (1998),129 Ohio App.3d 527, 535.
 {¶ 29} In reviewing the evidence presented in the instant case, we conclude that appellant cannot show plain error. Appellant's theory of the case was self-defense, and the trial court provided a self-defense instruction. During his testimony, appellant stated that, after being kicked out of Bucknor's house, he retrieved the gun from his car and went next door to Bliss's house "[b]ecause I was desperate for help and I was scared that Jason was going to come after me, shooting." (Tr. Vol. II, at 55.) According to appellant, he was "surprised" to find Bucknor at Bliss's residence, and he fired the fatal shot because Bucknor had a weapon pointed at him. While appellant described himself as being "scared" and "surprised" by the events, there was insufficient evidence to support a determination that appellant was provoked by sudden rage or passion at the time he shot Bucknor. See State v. Collins (1994),97 Ohio App.3d 438, 446 (where appellant did not state he was provoked, angry or lost control of his temper at any time during incident, appellant's "own testimony did not support and completely undermined any claim that his actions were in fact incited by serious provocation"). Here, under the facts presented, an instruction on voluntary manslaughter would have been incompatible with appellant's theory of self-defense, and we find no error plain or otherwise in the trial court's failure to provide an instruction on voluntary manslaughter. *Page 10 
 {¶ 30} Appellant's first assignment of error is without merit and is overruled.
 {¶ 31} Under the second assignment of error, appellant contends that his trial counsel rendered ineffective assistance. Specifically, appellant argues that trial counsel was ineffective in failing to request that the trial court instruct on the inferior offense of voluntary manslaughter.
 {¶ 32} In order to warrant a reversal of a conviction based upon ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, which requires the defendant to "show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." State v. Conway, 109 Ohio St.3d 412,2006-Ohio-2815, at ¶ 95.
 {¶ 33} At the outset, we note that "the test for whether a judge should give an instruction on voluntary manslaughter is the same test to be applied as when an instruction on a lesser included offense is sought." State v. Lee, Franklin App. No. 04AP-234, 2004-Ohio-6834, at ¶ 22 (finding that "trial counsel's decision not to request a jury instruction on voluntary manslaughter could be considered a matter of trial strategy"). There is a strong presumption that trial counsel's failure to request an instruction on a lesser offense is a matter of trial strategy, and "[t]his is especially true when the defendant claims self-defense because an instruction on the lesser offense may confuse the jury with inconsistent theories of the defense and/or reduce the hope of attaining a complete acquittal." Harris, supra, at 533. See, also, State v. Mackey (Dec. 9, 1999), Cuyahoga App. No. 75300 ("It is reasonable trial strategy to argue self-defense and not request an instruction on a lesser offense"). *Page 11 
 {¶ 34} Here, in light of our disposition of the first assignment of error, finding no error plain or otherwise in the trial court's failure to provide an instruction on voluntary manslaughter, appellant cannot demonstrate that his counsel's actions were either deficient or resulted in prejudice to him. See Lee, supra, at ¶ 23 ("because we have found that the trial court did not err when it did not instruct the jury on voluntary manslaughter, we cannot find that defendant's trial counsel's failure to request an instruction on voluntary manslaughter amounted to ineffective assistance of counsel").
 {¶ 35} Accordingly, appellant's second assignment of error is without merit and is overruled.
 {¶ 36} Under his third assignment of error, appellant concedes there was sufficient evidence to support the conviction for murder. He argues, however, that his conviction for murder was against the manifest weight of the evidence.
 {¶ 37} In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Ohio Supreme Court held in relevant part:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." * * *
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth" juror and disagrees with the factfinder's resolution of the conflicting *Page 12 
testimony. * * * "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
(Citations omitted; emphasis sic.)
 {¶ 38} In the present case, appellant was convicted of murder, which requires the state to show that appellant purposely caused the death of another. R.C. 2903.02.
 {¶ 39} Appellant did not dispute that he shot Bucknor. Rather, he claimed that he acted in self-defense. In support of his theory, appellant testified that Bucknor refused to pay for drugs and threatened him with a firearm. According to appellant, Bucknor pushed him out the door of Bucknor's residence and, as appellant was walking toward his car, Bucknor told him to leave his property, threatening that "he was going to kill me." (Tr. Vol. II, at 53.) Appellant further testified that Bucknor ran into his house, and appellant thought Bucknor "was going to grab the gun and come back to the door and see that I wasn't gone off his property." (Tr. Vol. II, at 55.) As noted under the previous assignment of error, appellant claimed he grabbed the weapon from his car and went next door to Bliss's residence because he was "desperate for help" and "scared that Jason was going to come after me, shooting." (Tr. Vol. II, at 55.) Further, claiming "surprise" in finding Bucknor at Bliss's residence, appellant testified that he shot Bucknor when he saw him at the back door with a gun raised and pointed at him.
 {¶ 40} The state presented contrary evidence through the testimony of Ferrell and Bliss. While Ferrell testified that Bucknor intended to "rip [appellant] off" of crack, and that *Page 13 
Bucknor pulled a knife on appellant inside Bucknor's residence, Ferrell never observed a firearm on Bucknor during the incident. Ferrell further testified that, after Bucknor kicked appellant out of his house, Bucknor came running back into the house a short time later and appeared scared, telling Ferrell to run over to Bliss's house. Bucknor then ran to Bliss's house, and Ferrell followed until he became scared after seeing appellant running up behind him. Ferrell returned to Bucknor's residence, and seconds later he heard a gunshot.
 {¶ 41} Bliss testified that Bucknor's girlfriend, Boyd, came over to her residence that day, appearing upset. A short time later, Bucknor appeared at her back door, and he was out of breath, "frantic." (Tr. Vol. I, at 118.) Seconds later, appellant appeared and shot Bucknor in the chest. Similar to Ferrell's testimony, Bliss never observed Bucknor with a firearm.
 {¶ 42} It was within the province of the jury to consider the conflicting evidence and to assess the credibility of witnesses.State v. Stanley, Franklin App. No. 06AP-323, 2007-Ohio-2786, at ¶ 35, citing State v. DeHass (1967), 10 Ohio St.2d 230. Further, "[t]he jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony." Stanley, supra, at ¶ 35.
 {¶ 43} In the instant case, the jury could rationally have found less than credible appellant's testimony as to why he did not immediately leave the area after being kicked out of Bucknor's house. During his direct examination, appellant offered the explanation that his car "had difficulties starting." (Tr. Vol. II, at 55.) However, during cross-examination, appellant indicated that he did not get in his vehicle and leave "[b]ecause it *Page 14 
would only encourage Jason to purposely run in to his house, grab his gun and come out shooting at me if I wasn't gone out of his sight." (Tr. Vol. II, at 76.) Further, despite appellant's claim of self-defense, he fled the scene in his vehicle and went into hiding following the shooting, staying at various locations with friends and acquaintances until he was discovered by authorities acting on a tip.
 {¶ 44} Based upon the evidence presented, the trier of fact could have reasonably rejected appellant's self-defense argument and determined that appellant killed Bucknor purposely. Thus, there was substantial evidence upon which the jury could conclude that all the elements of the offense were proven beyond a reasonable doubt, and we find that, in making this determination, the jury did not lose its way and create a manifest miscarriage of justice. Accordingly, we reject appellant's contention that his conviction for murder was against the manifest weight of the evidence, and his third assignment of error is overruled.
 {¶ 45} Based upon the foregoing, appellant's first, second, and third assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
 BRYANT and KLATT, JJ., concur. *Page 1